The first case called is Docket Number 122265, Agenda Number 2, Parmar v. Madigan, et al. Counsel, are you ready? You may proceed. Good morning, Your Honors. May it please the Court, I'm Assistant Attorney General Carl Helitz. I'm appearing this morning on behalf of the Attorney General and the State Treasurer. Your Honors, there are two independent reasons why the Appellate Court's decision in this case should be reversed and why the Circuit Court's decision should be affirmed. The first is sovereign immunity. The second is a voluntary opinion ballot. With regard to sovereign immunity, Your Honors, as Your Honors I'm sure know, Illinois abolished sovereign immunity with the 1970 Constitution. It was reinstated by the General Assembly. Section 1 of the Immunity Act provides that the State shall not be named as a defendant in any court. That is exactly what Mr. Parmar has done. He's brought a lawsuit against the Attorney General and the Treasurer, essentially a stand-ins for the State, seeking to recover tax money that he paid in Iraq. Now, the Appellate Court reasoned that there was an exception to the sovereign immunity doctrine. In this case, the Court said that it was the officer's suit exception. But the officer's suit exception is not an exception to the sovereign immunity doctrine that Mr. Parmar is entitled to invoke. That's because the officer's suit exception is always a forward-looking exception. It seeks to allow claims where the plaintiff is trying to enjoin a State officer or official from violating a law or violating the Constitution. And that's not what Mr. Parmar is trying to do. What Mr. Parmar is trying to do is to recover approximately a half million dollars in taxes that he claims that he irrevocably paid. In other words, the officer's suit exception is not for present claims but for claims that seek prospective relief. Mr. Ellis, this is the first time we're going to hear an argument on the officer's suit exception. Was it ever argued below, or did the Appellate Court come up with it on its own? The Appellate Court raised it in oral argument, Your Honor. It was a bit of a surprise, I think, to both myself and to counsel. The Court suggested that we file briefs, and then that order never came. And we received a decision that relied on the officer's suit exception and found that the case should be reversed. Okay. Thank you. So this critical distinction between present claims and prospective relief is in all of this Court's decisions, including the Court's decision that the Appellate Court relied on, Littaro. There is some language in Littaro that doesn't seem to make the distinction, but it's clear from the context of the Littaro decision that that particular case was not about seeking relief for past conduct but was to prevent state officials from conducting what the plaintiff claimed was an unlawful investigation. So, again, the officer's suit exception seemed reasonable to be applied in the Littaro case. That's very different than Mr. Parmar's case. And Mr. Parmar's brief doesn't really explain why the officer's suit exception should apply. It sort of just says that Littaro is the case he's relying on, which is essentially what the Appellate Court did. I think the Court should not rely on the officer's suit exception. It just doesn't fit these facts and should hold that Littaro should be confined to the context in which it was decided, which is for seeking prospective relief. That leaves Mr. Parmar with the second argument, which is the argument he actually raised in the Appellate Court and in the Circuit Court, which is that Section 15 of the Act is a provision that allows him to bring suit despite the state's immunity. Now, Section 15 doesn't refer at all to the state's liability. It doesn't reference the Immunity Act. So there's no reason to conclude that Section 15 is a waiver of the state's sovereign immunity. The language is the same. Well, can you help us with the plain language? Sure. Jurisdiction to hear and determine all disputes in relation to attacks arising under this Act shall be in the Circuit Court for the county having it venue. Why doesn't all mean all? It means all claims that are entitled to be brought under the Act. And this is not a case brought first under the Act. This is a case brought to the whole, but the Act doesn't apply. So Section 15 by its terms doesn't do that. But also it says It doesn't say all disputes come under the Act. It says in relation to attacks rising under this Act, didn't this tax arise under this Act? Mr. Parmar's claim is that the tax does not arise under this Act. His claim is that the Court should hold that the Act does not apply to his case. So in some ways he's not actually even coming under the language of Section 15. But even if we were to hold that Section 15 applied to him, it's still a claim that he's making that this is a waiver of sovereign immunity. And if he's claiming that this statute trumps Section 1 of the Immunity Act, this Court's cases are clear that this language would need to be clear and unequivocal in waiving sovereign immunity, and it doesn't do that. But it says jurisdiction is in the circuit court for all disputes. Isn't that clear and unequivocal? Well, there are disputes that can be brought in the circuit court. But this particular claim is one which the circuit court doesn't have jurisdiction over. So it would be strange for this case, for this statute provision to grant jurisdiction where we have another provision of law which says there is no jurisdiction. So at the very least, the statutes are in conflict with one another. Section 1 says in the Immunity Act the state shall not be brought as a defendant in any court. So Mr. Ehlers, to follow up on Justice Tice's question, where does this tax arise? What authority is it? The taxes. The tax that's being challenged. The section. What statute? The State Tax Act. Okay. And is that not the same statute that Justice Tice just read from? Yes, although I hope I can make my point. Maybe I didn't make it clearly. He's trying to argue that the Act doesn't. I realize that. But the reason he's challenging that is because Illinois is imposing a tax that arises under that Act. Isn't that the scenario? If you want to perceive his claim as a claim under the Act, then I suppose that's correct. But even if his claim is a claim brought under the Act, this provision would still have to be clear and unequivocal in waiving the state's sovereign immunity, and it doesn't do that. The cases are clear, but this language would need to be explicit, which is a quote from one of the cases, and it would need to refer to the Immunity Act, and it doesn't do that. So in that regard, Section 15 doesn't give Mr. Parmar a way of bringing a claim and making it safe. Even if he were able to escape sovereign immunity and to argue that Section 15 allowed him to bring his claim, he would then butt up against the Voluntary Payment Doctrine, which is the second independent reason why his claims were properly dismissed by the Circuit Court. The Voluntary Payment Doctrine provides where taxes are paid, the plaintiff cannot seek in court to recover them. Now, in cases like this one, where it is state taxes that are being sought to be recovered, the state has the protections of the Protest Monies Act, which provides that unless you file your taxes with a protest, you are forever barred from trying to recover them. And this statutory provision would have given Mr. Parmar an independent way of seeking to recover these taxes if he was concerned that they were not properly imposed on him. Is the Protest Act a waiver of sovereign immunity? Your Honor, the Protest Act sets up a special fund that is legally outside the state's revenue. It's actually part of a trust that sort of the Circuit Court oversees during the course of litigation. So it's never really brought into the state's coffers. So it's an exception in the sense that it allows litigation over the money. It's not an exception in the sense that the money is not really part of the state's funds, so it's outside the sovereign immunity doctrine. But it operates essentially as an exception to sovereign immunity. And this may be my last question, but, Ben, doesn't the Refund Fund Act function in the same way? No, the Refund Fund is for paying claims for people who file refund claims and are awarded refunds by the Attorney General's office. And they're able to take those refund claims after they're litigated in front of the Attorney General's office and paid off by the treasurer. But there's no litigation if the AG – I'm sorry, it's not my last question. If there's a refund claim made and the AG doesn't comply with it, there's no recourse? No, there's recourse. To what, to the circuit court? You can seek administrative review under a cert type action. But not in the circuit court. No, a cert action in the circuit court wouldn't be allowed because that is an exception to sovereign immunity as well. But it's not one that Mr. Farmar brought. He never filed a claim that his seeking was erroneously decided by the Attorney General's office. He just went to circuit court and said, I'd like my money back. He never filed a claim, had it denied, and then sought certiorari review. Mr. Ellis, you mentioned the protest doctrine. He'd have to pay that under duress, though, wouldn't he? Yes. And that hasn't been alleged at all. Well, if he were to try to argue, as he does, that he has an exception to the voluntary payment doctrine, there are two exceptions. The one is to say that he doesn't have any knowledge. He didn't have knowledge at the time, so he would be excused. The other would be to say that he was acting under duress at the time he paid the tax, and courts have allowed in that situation a plaintiff to seek recovery. Although not from the state that I can find. The Protest Monies Act protects the state, and the cases that he's relying on seem to be tax cases from other entities like the city of Chicago. And wouldn't Geary v. Dominick's be one of the cases on that? Geary was a case involving Chicago's tax on feminine hygiene products. That was a case where the court said that the plaintiff's inability to bring a claim  That was duress in that situation because the theory of the plaintiff was that we would not be able to receive the products if we didn't file a protest. And the court viewed the inability to receive the feminine hygiene products as duress. Just like in the ghetto case where the plaintiff, if he had brought his claim and argued that he was protesting his tax, there was a possibility he would have lost his phone service. These cases are all examples where a plaintiff has suffered or will suffer collateral consequences if they bring a protest action. And in that situation, a plaintiff can claim duress. But the court has never allowed someone to argue that the tax that is imposed itself causes the duress. In that case, if that were true, if you could do that, then obviously everyone would pay tax and everyone would say, I paid my taxes under duress because I was concerned if I didn't pay them I would incur liability. Are any of the voluntary payment cases in the context of the state tax? I looked quickly at that question recently, Your Honor. And I think the cases involve sales tax and they come out of the city of Chicago. And so they involve sales tax, which is a state statute, but the revenue is going to the city. So I guess my answer is no. But I'm not relying per se on the Protest Monies Act. I'm just saying in this case where we have state revenue, Mr. Parmar had access to the Protest Monies Act. And where you have access to a statutory procedure like that, I don't think it's reasonable to claim that you were under duress. It's also not reasonable to claim that you didn't know about it or Mr. Parmar had the benefit of counsel at the time he filed and paid the tax. His counsel actually signed the tax forms that he tendered years later claiming, I shouldn't have done that. I'd like that money back. Your Honor asked about whether he could have filed a claim seeking a refund. And my answer was yes, he could bring assert action. But I'd ask the court if this is the way you want to think about this. Look at Section 14 of the Act, which says that the statute of limitations, he would have to be within time to do that, too. And his claims where he was seeking a refund came very far after he paid the tax. I think it was 20 months. But you haven't raised that yet, about the statute of limitations. That's not part of this case now. No, it's not. But I'm just saying if we were to ask the question, well, could the case go back, that would be a problem that he would face as well as the other claims, the other problems that I'm pointing at. So, Your Honors, for both of these reasons, and if you agree with either one of them, the appellate court's decision should be reversed. The state is entitled to sovereign immunity, and the state is entitled to raise the voluntary payment doctrine. For both of those reasons, the appellate court's decision is correct. Any further questions? Seeing none, thank you, Mr. Helitz. Mr. Haight. Good morning, Your Honors. If it may please the Court, my name is Nicholas P. Haight. I am here today on behalf of Plaintiff Appellant, Commender S. Parmar, individually, and as executor of the estate of Surrender Kate Parmar. As you know, we're here today on defendant Appellee's request to review the circuit court's correct ruling that, one, my client's constitutional claims fall squarely within the scope of the Office of Substitute Acceptance of State Sovereign Immunity Protections and may therefore broaden the circuit court, and two, that neither the voluntary payment doctrine nor the protest act operate to bar my client's claims when his estate tax were paid involuntarily and under duress. How would we know that they were paid involuntarily and under duress if you didn't file it under the protest act? Well, Your Honor, we did not file it under the protest act, and the way that you would know it's under duress is, I think, twofold. One, as the appellate court reasoned, I believe the statutory imposition of penalties and interest would cause per se duress, and second, duress is a feeling that someone would have based on their own circumstance of whatever was imposed upon them, and in the underlying complaint, the plaintiff has alleged that he felt duress, and that is why he made the payment when he did. So first let me go back to why there is the statutory duress almost per se as the appellate court had ruled. When you get into that argument, Mr. Heff, can you touch upon why did the appellate court arguably create an exception that would swallow the rule? I mean, all taxes are paid under threat of some kind of penalty, so how does that amount to duress? Well, I'm glad you asked. I think there's a very important distinction with this specific tax statute and act in the nature of there is an imposition of the tax liability through the Estate Tax Act, and there's interest and penalties should you not file it in a timely fashion or not file it at all. The distinction between that and other tax statutes in the state of Illinois would be, one, that the original tax liability here is one of an estate. The estate is a separate taxpayer. There's an estate identification number, which will file taxes on it. If Mr. Parmar in this case fails to file the taxes, the act allows for that taxes, penalties, and interest to shift to the burden of the representative, the executor in this case. So this is a very unique statute compared to other tax statutes. For example, the income tax statute. If you don't pay your own income tax liability, they can assess penalties and interest. That might not amount to duress. But in this case, there's an estate tax. It has a tax liability. So if the representative does not follow through and make sure that that's paid using estate's money, i.e. another taxpayer's money, that burden for the taxes, penalties, and interest now can shift and jump to an entirely different taxpayer than the executor. So why this is unique and why this is more duress than normal tax statutes is because a tax liability of one taxpayer of the estate can jump and be shifted to an entirely different taxpayer. So something that wasn't your burden as the underlying tax can now be your burden to pay because you didn't comply with the filing requirements. Do we know why he didn't pay it under protest? Well, the reason why that it wasn't paid under protest, and again, this was not briefed out in the trial court or argued because it never had the opportunity, but if you look at the record, Mr. Parmar's estate taxes were paid nearly 20 months after the deceased's passing. Death, I'm sorry, passing. And so at the point when he came to counsel, a return was immediately prepared and filed an estimated tax for pay because by that time, not only was the nine-month window to file the taxes passed, there was no extension applied for. So by the time when Mr. Parmar realized that he needed to file the tax, he was already way behind, and so the election to file was done because the duress that was imposed. He found out that there was this tax due, there was penalty interest that had been accruing for months, and that if he didn't pay it, he could become personally liable for it. So what he did then was make an immediate payment upon realizing that he had this obligation. Was he represented at all times by counsel? Or do we know? He was represented by counsel, but there were claims in ancillary merits which are now before this court for ineffective assistance. So he had relied on professionals who did not advise him accordingly. But to that same point, Your Honor, I would also argue that this, and we have made the argument, that the nature of this type of protest is far beyond what I think the protest act contemplates in the sense of as it relates to the estate tax. Generally, somebody's going to protest that an asset is includable in the Illinois taxable estate. Maybe you have a Missouri piece of property, and though it's in the federal estate, it shouldn't be included in the Illinois, or that a deduction or a credit is not applied correctly. The nature of this protest is one that is so outside the scope of the general notion of protest in that a competent tax professional, a reasonable business person, wouldn't know to file a protest because this isn't something with the underlying act itself. It's this narrow applicability of a statute that was entered into law and then retroactively imposed 12 days before. So you need essentially an expert or somebody with a keen eye for constitutional questions to even know that the protest act could be available in this circumstance. So my general answer would be is I think the type of action here doesn't fall within the kind of contemplated scope of the protest act due to the unique nature of the facts and circumstances. Does the claim fall within the protest? No. Does the claim fall within the refund fund act? I would argue that it would because ultimately... Let me answer this. Did you plead it that way? Is that in your complaint? We have pledged that the estate tax refund fund would be an available mechanism to refund the money in the sense of... It's in your complaint? I believe we had argued that if there is no tax due... Is it in your complaint? No. No, I believe we had said that if there is no tax due, that any payments made would amount to a refund for which the estate tax fund... I do not know, Your Honor. So there's some suggestion here that this is a claim against the refund fund, right? Certainly the appellate court kind of thought that was a piece of this discussion, right? Yes. And the refund fund aspect of the statute says that when a taxpayer pays their taxes, the treasurer turns over 94% of the general revenue fund and retains 6% of the amount of the tax that was paid to be a resource to make a refund. So you're asking for 6% of the tax that was paid? No, we would be asking for all of the amount that was paid that should not have been. How does that fit with the refund fund act? Well, not every... That 6% is withheld from every estate tax payment that's made, and I would be willing to guess without knowing the actual statistics that the majority of estate taxes that are paid do not amount and result in a refund. So I think that although only 6% of his tax was held in that fund, it also holds 6% from any number of other taxpayers. And from my reading of the fund, it doesn't say that you can only get your amount you paid in back, but that the fund is generally available. So if in one instance a taxpayer is going to get a refund of 10% of what they had paid in, well, there's going to be additional funds in the estate tax refund fund to cover what that would be because there's no cap on how much you can recover if your amount overpaid was beyond what the tax liability was. So I don't believe that his claim could only be for that 6% of his held back because then there's going to be a whole pot of money that is never used for a refund because a large amount of estates don't require a refund after filing. Doesn't the Act allow the treasurer to sweep that money if there is a large amount of money that remains in the refund fund that's not used? It does, Your Honor. Back to what you were going to start with, the officer's suit exception. Yes. Would you agree that it's long been established that that exception applies only to claims for prospective injunctive relief? I think that's an accurate understanding. All right. Well, and how does that not defeat your claim under that? Well, I think that that would be looking only at my claim from the side of the plaintiff and not the side of the defendants in that the relief that we're requesting would be guidance to say that the imposition of a retroactive tax is not permitted. And so I think that future guidance would be for the benefit of the defendant, in this case the state, so the Attorney General's Office knows in the future when it should step in and defend essentially a tax period, in this case saying that the application of an estate tax or an application of a retroactive tax that didn't exist at the time the transaction was completed should not be maintained. So as it applies to this plaintiff, it would be retroactive, not prospective. But as it applies to the Attorney General, it would prove guidance to others? I mean, is there a standing question with respect to that? I do not know the answer to that, Your Honor. Okay. If you're finding that Circuit Court has jurisdiction in light of the procedures, are you agreeing that the procedures under the Protest Act would be applicable except for the duress, the exceptions to the Protest Act duress or involuntary payments? I think that's correct, but in this case we have duress. I think as we've discussed, I think there would be per se statutory duress. And to the extent that this Court doesn't believe that the statute itself in the shifting of potential tax burden and penalties and interest from one estate to an individual, I think that due to the fact that Mr. Parmar has pled it and that the statute itself is so close, if it's not per se duress, that you couple the impact of the statute and the fact that he's claimed duress in his complaint should be enough that at a minimum that all in a motion to dismiss standard that he should be given all reasonably drawn inferences in the benefit of what he's pled, and it should go back to the trier effect to hear the evidence as to why he felt duress. Because again, if you have the duress element, then based on Gary versus Dominic and others, then the Protest Act and the voluntary payment doctrine would not apply. So that question of duress, if it's not caused by the statute, which is unique in the nature of how it extends the penalties and interest, then at least we're entitled to be back in the circuit court for the judge to hear evidence as to why Mr. Parmar felt duress. Is the entire basis of your claim that the act cannot be applied retroactively to your claim? Of the underlying claim? Yes, Your Honor. The best constitutional claim that you have. Yes, the underlying constitutional claim is the decedent died subsequent to her death. The act was passed and retroactively applied to decedents dying in the 12-day window before the act was passed, yes. But you're not asking only for the state treasurer to change practices. You're asking for $500,000 back. Yes. From the general revenue fund. Well, from wherever it ultimately needs to be paid. So we're asking for a court to rule that the tax should have never applied, therefore he should have paid no tax and would be due a refund of the entire amount he's paid. Now, I would argue that that amount should be paid out of the state tax refund fund, but such if it didn't have excess funds, I suppose that would be. You'd be asking the state to find somewhere else to pay. But, again. The general revenue fund. I would anticipate that would be where they would look next. Are you familiar with any cases, either the duress cases or let's just say the officer exception cases, where there's an order in the state treasurer to turn over money that's been commingled with the general revenue fund? No, Your Honor. Clarify for me, when the decision was made to pay the taxes under duress, why would they not pay it under the protest act? Well, that's a good question, Your Honor. And I believe that the answer would be is that the time when the tax was paid and it came to the executor's attention, Mr. Parmar's, that there was a tax due, he was already or the estate was already almost 20 months late. And so I believe that in an effort to get the tax on file to ensure that he wouldn't end up with personal liability, he went to the first avenue, which was pay the tax, and then filed in circuit court. That's exactly why the protest doctrine is there, so somebody could argue later on that it was an illegal tax. I mean, in Geary, wasn't it the fact that the purchaser could not get the item that they wanted to buy from the store, and therefore that that was the duress? The tax couldn't buy the item unless they paid the tax. Yes, that's correct. And in that nature, they're saying that the access to feminine hygiene products and not being able to afford them because of the tax would amount to duress. But I would think in this instance that due to the underlying nature, that they're asking for, as we've said, half a million dollars of tax. So although in other instances it's when there's an amount tacked on to telephone service, and if you don't pay it, you might not have telephone service, and then you can't clear it for your business. In this instance, if you pay half a million dollars and you don't have that money, that's an essential thing. So to be able to buy the feminine hygiene products, they're worried about the tax on top of it. If you have to pay the state of Illinois $500,000, you're not worried just about the tax on top of the feminine hygiene products. You're worried about the cost of the underlying product itself. So I think due to the nature of the fact that this is asking for so much money in the sense of taking that money that's paid for state tax liability, that due to the scope of the amounts in question, that would arise at the same level of financial concern that would make this relevant to that. Mr. Heffernan, when you said that this is a different type of tax, when we were talking about the fact that the whole exception swallowing the rule, you mentioned that it's different in the sense that personal liability may attach, and that's why the payment was made. If there was a protest act action filed, would that stay any personal liability until that claim was determined? I would assume it would since you are in court arguing as to the tax liability, and you will have then, because again, by paying under the protest act, you have paid the amount due. So I guess in that sense it would unless the court in a protest action disagreed with you, and then theoretically you could have additional taxes and interest if you miscalculated the estate tax that was due. So would that negate the difference then? I mean, when I asked the question about all taxes are paid under threat of some kind of penalty, you indicated, well, I'm glad you asked the question because this is a different tax that would shift the burden to the personal taxpayer. And if the protest act would somehow insulate that personal taxpayer, is there that great a difference? No, I wouldn't say there's a great difference, but I think there's enough of a difference where step one, before you analyze whether the protest act should be used or utilized, would be first looking whether there is duress that's compelling him to pay it sooner and getting the money paid and do whatever you can as fast as possible. I believe in this instance that's where that distinction in the act changes is, in this case you have an executor who ultimately finds out a tax is due long after it was due. There's penalties and interest taking away, and he does what a reasonable person would do. He pays the tax and then ends up going to the circuit court to figure out why he paid it when he shouldn't have. Thank you. So to that end, we're asking for this court to, one, affirm the appellate court's decision with respect to the applicability of the officer's suit exception to Mr. Parmar's case, which would take the sovereign immunity question off the table, affirm the existence of statutory duress, or to the extent you don't believe it arises to that level, remand the case on the duress issue back to the trial court for further hearings on what Mr. Parmar felt and what amounted to duress, and thirdly, affirm the trial court's decision with respect to the inapplicability of the voluntary payment doctrine and the protest act due to the aforementioned duress. The other relief that we're asking is for this court to reverse the trial court's holding with respect to the waiver of state sovereign immunity through the express grant of jurisdiction under Section 15 of the State Tax Act. So if there's no further questions, thank you. Seeing none, thank you. Goodbye. Your Honors, I think there's some confusion under the statute as to what's possible. As far as personal liability of taxes are concerned, Section 10 of the Act provides that the executor of the state is liable for taxes to the extent that the property was received or controlled by him. Mr. Parmar, in this case, was the executor of a $5 million estate. His tax liability was limited to the $5 million he, in fact, had. So his argument of duress makes no sense unless he intended to spend that money and pulled it back from paying taxes. If he were to have wasted the estate's assets, then, of course, he would be personally liable under the Act, but only if he had wasted the estate's assets. So his claim that he was under duress makes no real sense because all he had to do was not close the estate and either wait for the state of Illinois to sue him for the tax money, which he's entitled to do. In that case, he could have raised his constitutional claims or he could have brought the protest money back. He was an executor of a $5 million estate with counsel and an accountant, and he didn't do anything for 20 months and then just pay the taxes. So the argument that he was under duress makes no sense. With regard to his claim that he's seeking a refund under the Refund Act, that's not possible under Section 7 because Section 7 provides in its beginning, if the state tax credit is reduced after the filing of the Illinois Transfer Tax Return, then you can draw on the refund. But he doesn't deny the fact that his state tax credit, which is calculated in this circumstance under federal law, if his state tax credit is not reduced, then he can't use Section 7 to draw on the refund provision. So he didn't really have the opportunity to bring a Section 7 refund claim. He couldn't draw on that particular fund. That would leave him with the funds of the state of Illinois to pay his claim, and that, of course, is what the Sovereign Immunity Doctrine protects the state from. The suggestion that there's per se statutory duress, which is a term he's used repeatedly throughout the litigation, is unprecedented in the law. There's no per se statutory duress. If there were per se statutory duress, then every taxpayer would, in fact, be someone who was paying under duress, and every taxpayer could bring a claim whenever they decided that they wished they hadn't paid money 20 months later or 20 years later. He would be able to argue, oh, back then I paid that tax under duress, I'm sure of it, because there were penalties of interest, which, by the way, the state had never threatened Mr. Parmar with. Mr. Parmar self-assessed this tax, sent the check in, along with his tax form, which was signed by his lawyer. If we agree with you that Officer Suit doesn't apply and this is a voluntary payment, in effect, has he forfeited or waived the opportunity to raise the constitutional issue? Yes, Your Honor, that's exactly right. So we don't get to the constitutional issue. Yes, and he has forfeited it. There were two, at least, opportunities when he could have raised it. As I said, if he had done nothing and had waited for the state of Illinois to sue him, then he would have been worried about the penalties of interest that would have accrued. That's true. But he would have been able to raise his constitutional claim, and if he had prevailed on that, then the estate would have owed nothing. By the way, if he had lost on that, then the estate would have been liable for that payment, not him. There was no personal liability if he had waited for the state of Illinois to go after the estate. So this idea that somehow he was worried about being personally responsible for this money is not true. He was the executor of the estate. He wasn't the person responsible to pay the tax. The other way he could have raised the constitutional claim, if he wanted to avoid the risks of penalties and interest, would be to file that Protest Monies Act. In that case, if he had filed under protest, then he would have had a circuit court hearing about the constitutionality of the application of the law to his particular facts. If he had prevailed in that case, then there would have been no interest, no penalties. And by the way, in that case, the state would have paid him interest on the money that was in that special fund waiting for a judgment because the Act, the Protest Monies Act, provides that there's interest paid to the plaintiff. So he had two perfectly good opportunities to raise his constitutional claim. What's really happened here is that he realized he had a, I could have had a V-8 moment, where he realized I could have 20 months ago or any time before I filed my claim, I could have brought either that Protest Monies Act or he could have been advised to just wait, which would have gotten him to the same place. So yes, Your Honor, sorry for the long answer, but he has worked with it, and he claimed that the statute is unconstitutional. And if he lost on that, interest would accrue as to the state's claim as well? If he had filed a Protest Monies claim, then he would have stopped the payment of interest and penalties. Because the dispute would be over that fund, and that fund would have been awarded to the state as if the state had always had it, and there would be no opportunity for us to seek penalties and interest. So he had a perfectly good statutory procedural opportunity to bring that type of claim. In fact, the General Assembly was probably thinking of exactly that concern. If someone wants to bring a claim against the state, this is how you do it. His entire theory of recovery is an end run around the Protest Monies Act. I don't know how the Protest Monies Act can be given any meaning at all. If a plaintiff can come forward and argue per se statutory duress, I'm suing the state, giving my money back. That just sort of wipes out all the voluntary payment doctrine law. It wipes out the state's sovereign immunity, unless there's some waiver of it under Section 15. So even if we were to say there's a waiver under Section 15, and I really want to say there's not, because I don't think it's clear enough to quibble, it all goes to the same place. The Circuit Court properly dismissed Mr. Farmer's complaint. I don't believe Mr. Farmer's complaint referenced the protest fund that he's now talking about. I may be wrong about that, but obviously you can look it under. The gist of his complaint was this is all unconstitutional. Please give me my money back. It wasn't I'm bringing a claim under Section 7 and they won't give me my money back. So unless there are any further questions. Seeing none. I'd ask that the appellate court. I do have one. Yes. With respect to the prospective as to the claim as it relates to the defendant versus retro, you heard that argument. Yeah, I think he's very confused. The opportunity for a decision to give the Attorney General guidance for future cases is not at all what the doctrine is all about. As I think Your Honor mentioned, he has no standing to seek a declaration to help the Attorney General for future cases. He's got to argue about his case and his case doesn't involve some future prospective application, misapplication of law by the Attorney General. His case is about a past misapplication of law, so he says. So his case clearly falls under the present claim side of the doctrine and not prospective relief. There's an amicus brief here and that brings this discussion, makes a very nice discussion of this, explains the present claim doctrine and future prospective relief, the distinction, and why it's important that the court maintain that clear line between present claims and future relief claims. Thank you. If there are no questions, I'd ask that the appellate court's decision be reversed and that this court reaffirm the decision of the circuit court. Thank you, Your Honor. Thank you. Case number 122265, Parmar versus Lisa Madigan, will be taken under advisement as agenda number two. Mr. Elitz, Mr. Haith, we thank you for your arguments today and your excuse for the defense.